BRAVERMAN KASKEY, P.C.
David L. Braverman (ID No. 35145)
Richard S. Julie (ID No. 205384)
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 575-3800
Facsimile: (215) 575-3801
dbraver@braverlaw.com

*Filed and Attested by*
*PROTHONOTARY*
*16 APR 2012 05:55 pm*
*J. MURPHY*

*Attorneys for Plaintiffs*

THE MEYER-CHATFIELD
CORPORATION
261 Old York Road, Suite 614
Jenkintown, Pennsylvania 19046,

BENNETT S. MEYER
c/o The Meyer-Chatfield Corporation
261 Old York Road, Suite 614
Jenkintown, Pennsylvania 19046,

ZCRACKERBOX, LLC
1106 Morris Road
Wynnewood, Pennsylvania 19096, and

BRAVERMAN KASKEY, P.C.
1650 Market Street, 56th Floor
Philadelphia, Pennsylvania 19103,

                                    Plaintiffs,

                    v.

ALAN J. ROSS, individually and d/b/a
SAVE ASSOCIATES
687 Highland Avenue, Suite 1
Needham, Massachusetts 02494,

                    and

ALAN J. ROSS INSURANCE
AGENCY, INC. d/b/a SAVE
ASSOCIATES
7 Harvard Street
Brookline, Massachusetts 02146,

                                    Defendants.

COURT OF COMMON PLEAS OF
PHILADELPHIA COUNTY

CIVIL ACTION -- EQUITY

APRIL TERM 2012

NO. **12      2760**

COMMERCE PROGRAM

Case ID: 120401805

# NOTICE

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| PHILADELPHIA BAR ASSOCIATION<br>Lawyer Referral and Information Service<br>1101 Market Street, 11th Floor<br>Philadelphia, Pennsylvania 19107<br>(215) 238-1701 | ASOCIACIÓN DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>1101 Market Street, 11th Floor<br>Filadelfia, Pennsylvania 19107<br>(215) 238-1701 |

2

Case ID: 120401805

BRAVERMAN KASKEY, P.C.
David L. Braverman (ID No. 35145)
Richard S. Julie (ID No. 205384)
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 575-3800
Facsimile: (215) 575-3801
dbraver@braverlaw.com

*Attorneys for Plaintiffs*

| | |
|---|---|
| THE MEYER-CHATFIELD<br>CORPORATION<br>261 Old York Road, Suite 614<br>Jenkintown, Pennsylvania 19046, | COURT OF COMMON PLEAS OF<br>PHILADELPHIA COUNTY<br><br>CIVIL ACTION – EQUITY |
| BENNETT S. MEYER<br>c/o The Meyer-Chatfield Corporation<br>261 Old York Road, Suite 614<br>Jenkintown, Pennsylvania 19046, | APRIL TERM 2012<br><br>NO. _____ |
| ZCRACKERBOX, LLC<br>1650 Market Street, 56th Floor<br>Philadelphia, Pennsylvania 19103, and | COMMERCE PROGRAM |
| BRAVERMAN KASKEY, P.C. | |
| Plaintiffs, | |
| v. | |
| ALAN J. ROSS, individually and d/b/a<br>SAVE ASSOCIATES<br>687 Highland Avenue, Suite 1<br>Needham, Massachusetts 02494, | |
| and | |
| ALAN J. ROSS INSURANCE<br>AGENCY, INC. d/b/a SAVE<br>ASSOCIATES<br>7 Harvard Street<br>Brookline, Massachusetts 02146, | |
| Defendants. | |

## VERIFIED COMPLAINT

Case ID: 120401805

# COMMERCE PROGRAM ADDENDUM
## TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

**X**  1.  Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

**X**  2.  Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

        (1)  Uniform Commercial Code transactions;

        (2)  Purchases or sales of business or the assets of businesses;

        (3)  Sales of goods or services by or to business enterprises;

        (4)  Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

        (5)  Surety bonds;

    **X**   (6)  Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

        (7)  Franchisor/franchisee relationships.

    3.  Actions relating to trade secret or non-compete agreements;

    4.  "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

**X**  5.  Actions relating to intellectual property disputes;

    6.  Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

    7.  Derivative actions and class actions based on claims otherwise falling within these ten types, and consumer class actions other than personal injury and products liability claims;

    8.  Actions relating to corporate trust affairs;

    9.  Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

    10.  Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

Plaintiffs, The Meyer-Chatfield Corporation ("MC"), Bennett S. Meyer ("Meyer"), Zcrackerbox, LLC ("Zcrackerbox"), and Braverman Kaskey, P.C. ("BK" and, together with MC, Meyer, and Zcrackerbox, "plaintiffs"), for their Complaint against defendants Alan J. Ross, individually and doing business as SAVE Associates ("Ross") and against The Alan J. Ross Insurance Agency, Inc. doing business as SAVE Associates (the "Agency" and, together with Ross, "defendants"), aver as follows:

## THE PARTIES

1.      MC is a Pennsylvania corporation with its principal place of business located at The Pavilion, 261 Old York Road, Suite 614, Jenkintown, Pennsylvania 19046.

2.      Meyer is an individual who resides in Huntingdon Valley, Pennsylvania. Meyer is the chairman and chief executive officer of MC and maintains a mailing address at MC's offices.

3.      Zcrackerbox is a Pennsylvania limited liability company with its principal place of business at 1650 Market Street, 56th Floor, Philadelphia, Pennsylvania 19103.

4.      BK is a Pennsylvania professional corporation with a registered office address of 1650 Market Street, 56th Floor, Philadelphia, Pennsylvania 19103.

5.      Ross, individually and doing business as SAVE Associates, is a citizen of the Commonwealth of Massachusetts, with an address at 687 Highland Avenue, Suite 1, Needham, Massachusetts 02494.

6.      The Agency is a Massachusetts corporation with its principal place of business located at 7 Harvard Street, Brookline, Massachusetts 02146.   Ross is the president and registered agent of the Agency, and may be served with process on the Agency's behalf at 687 Highland Avenue, Suite 1, Needham, Massachusetts 02494.

2

Case ID: 120401805

## VENUE

7.      Venue is proper in Philadelphia County pursuant to Pa.R.C.P. Nos. 1006(a)(1) and 2130(a) because the causes of action asserted herein arose in Philadelphia County.   Moreover, defendants have expressly agreed in writing that each defendant "irrevocably consents and submits to the exclusive jurisdiction and venue of any of the Courts of the Commonwealth of Pennsylvania including the Court of Common Pleas of . . . Philadelphia County" in connection with any suit arising out of or relating to the written contract which forms the basis of plaintiffs' claims asserted herein.   *See* Agreement dated June 26, 2008 (the "Revised MRB Agreement," a true and correct copy of which is attached hereto as Exhibit A), § 11(b).

## FACTUAL BACKGROUND

### A.      The Settlement Agreement

8.      Ross is the inventor of record of a United States Patent, Number 5,974,390, dated October 26, 1999 (the "Patent").

9.      On May 27, 2008, Balshe LLC ("Balshe") and The Simon Law Firm ("Simon") commenced a lawsuit against Ross in the Circuit Court of Cook County, Illinois.   Ross timely removed that action (the "Illinois Action") to the United States District Court for the Northern District of Illinois.

10.      All parties to the Illinois Action executed a Settlement Agreement and General Release (the "Settlement Agreement," a true and correct copy of which is attached hereto as Exhibit B) dated June 26, 2008, pursuant to which Balshe, Simon, and Ross agreed to settle the Illinois Action.   *See* Settlement Agreement, § 24.  MC, although not a party to the Illinois Action, is also a party to the Settlement Agreement.   *See id.* at 1.

3

11.     The Settlement Agreement requires that the parties create a new entity (identified therein as "Newco") "for the purpose of commercially exploiting the Patent." *Id.*, § 1. It provides that "[t]he form and jurisdiction in which Newco will be organized/created shall be as mutually agreed to by Balshe[, Simon,] and MC." *Id.*

12.     In accordance with the Settlement Agreement, Balshe and/or Simon caused to be formed a Delaware limited liability company which is known as Institutional Pooled Benefits LLC ("IPB"). IPB is the "Newco" contemplated in Section 1 of the Settlement Agreement.

13.     The Settlement Agreement requires Ross to "execute all necessary documents to assign to [IPB] all right, title and interest in the Patent." *Id.*, § 2.

**B.     The Revised MRB Agreement**

14.     On June 26, 2008 – the date of the Settlement Agreement – Ross, the Agency, MC, Meyer, and BK entered into the Revised MRB Agreement. *See* Revised MRB Agreement (Exhibit A hereto) at 7-8.

15.     The Revised MRB Agreement provides that Ross and the Agency:

> shall indemnify, defend and hold harmless Meyer, MC and BK, and their respective shareholders, directors, officers, employees and agents, from and against any damages, losses, costs and expenses (***including attorneys' fees***) suffered by any such party, as a result of a breach of this Agreement by [the Agency] and/or Ross or suffered as a result of the enforcement by Meyer, MC and/or BK of this Agreement. If Meyer, MC and/or BK shall prevail in any action at law or in equity to enforce any provision of this Agreement, [the Agency] and Ross shall pay Meyer's, MC's, and/or BK's costs and expenses, ***including attorneys' fees***, incurred in enforcing this Agreement.

*Id.*, § 9 (emphasis added).

4

Case ID: 120401805

16.    The Revised MRB Agreement, by its terms, is governed by Pennsylvania law. *See id.*, § 11(a).

17.    In executing the Revised MRB Agreement, each of Ross and the Agency "represent[ed] and warrant[ed] to Meyer, MC and BK that . . . [the Revised MRB] Agreement, when executed by all parties, will constitute valid obligations of Ross/[the Agency], legally binding on him/it and enforceable in accordance with its terms." *Id.*, § 7(b).

18.    Ross and the Agency expressly "agreed that at all times each party shall have the right to insist upon and *enforce* strict compliance with each and every provision of [the Revised MRB] Agreement." *Id.*, § 13 (emphasis added).

## C.    The Patent Transfer Obligation

19.    The Revised MRB Agreement refers to the Settlement Agreement's "Newco" (*i.e.*, IPB) as the "Patent Entity." *Id.* at 1, eighth recital.

20.    The Revised MRB Agreement requires Ross and the Agency to "transfer all of their right, title and interest in the Patent to the Patent Entity in accordance with the terms of the Balshe Settlement Agreement." *Id.*, § 1.    That is, the Revised MRB Agreement requires Ross and the Agency to transfer all of their rights in the Patent to IPB (the "Patent Transfer Obligation").

21.    The only condition precedent to Ross's and the Agency's Patent Transfer Obligation was the formation of IPB.    That condition was satisfied immediately upon Ross's and the Agency's execution of the Settlement Agreement and the Revised MRB Agreement in June 2008.

5

22.     Despite the fact that all conditions precedent to the Patent Transfer Obligation have been satisfied, defendants have not satisfied such Obligation, in that they have failed and refused to transfer their interest in the Patent to IPB.

**D.     The MC Exclusive Obligation**

23.     Pursuant to Section 4 of the Revised MRB Agreement, Meyer was required to cause MC to pay Ross a total of $119,994.00 over the course of a twelve-month period commencing on August 1, 2008. *See id.*, § 4(a). At Meyer's direction, MC paid these funds to Ross, and Ross accepted said payments, all pursuant to Section 4 of the Revised MRB Agreement.

24.     In that same Section 4 of the Revised MRB Agreement, Ross agreed that, upon IPB's formation (*i.e.,* beginning in late Spring of 2008), and in consideration of, *inter alia,* the payments to Ross, Ross would work exclusively for MC for a minimum of two years, would engage in no other employment, and would use his best efforts to sell new insurance policies on MC's behalf and in conjunction with MC's sales representatives (the "MC Exclusive Obligation"). *Id.*, §4(b).

25.     Though all conditions precedent to the MC Exclusive Obligation have been satisfied, Ross has never complied with the MC Exclusive Obligation. Ross never performed any services on behalf of MC. He never sold a single insurance policy on MC's behalf, and never exerted ***any*** efforts (much less his "best efforts") to sell any insurance policies on MC's behalf. Nor has Ross paid back the nearly $120,000.00 he received from MC as consideration for the MC Exclusive Obligation.

Case ID: 120401805

26.     Subsequent to the execution of the Revised MRB Agreement, in the second half of 2008, BK assigned its rights under the Revised MRB Agreement to Zcrackerbox.

## CLAIM FOR BREACH OF CONTRACT

27.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 26 of this Complaint as though set forth at length herein.

28.     Meyer, MC, BK, Ross, and the Agency entered into a valid, binding and enforceable contract (the Revised MRB Agreement) supported by legally sufficient consideration. BK's rights under the Revised MRB Agreement have been assigned to Zcrackerbox.

29.     Plaintiffs have performed all of their obligations pursuant to the Revised MRB Agreement.   All conditions precedent to defendants' obligations have been satisfied.

30.     Defendants have materially breached the Patent Transfer Obligation by failing to assign the Patent to IPB.

31.     By reason of defendants' breach of the Patent Transfer Obligation, plaintiffs have been damaged in an amount substantially in excess of the amount requiring arbitration referral under the local rules of the First Judicial District.

32.     The Patent – by its very nature as a patent – is unique.  There is no adequate substitute for the Patent.

33.     The Patent will ultimately expire pursuant to 35 U.S.C. § 154(a)(2).  By its very nature, the Patent is a wasting asset, the value of which diminishes with each passing day.

Case ID: 120401805

34.     Plaintiffs accordingly have no adequate remedy at law, and are therefore entitled to entry of an order compelling defendants to transfer all right, title, and interest which they own in the Patent to IPB.  Such specific enforcement is expressly authorized by Section 13 of the Revised MRB Agreement.

35.     Ross has materially breached the MC Exclusive Obligation as set forth hereinabove.

36.     By reason of Ross's breach of the MC Exclusive Obligation, MC has been damaged in an amount substantially in excess of the amount requiring arbitration referral under the local rules of the First Judicial District.

WHEREFORE, plaintiffs demand judgment in their favor and against all defendants, jointly and severally, for:

   a.  an order compelling defendants to transfer all right, title, and interest in the Patent to IPB in accordance with the Revised MRB Agreement and the Settlement Agreement;

   b.  compensatory damages (including consequential damages) in an amount in excess of the amount requiring arbitration referral under the local rules of the First Judicial District;

   c.  interest;

   d.  costs of suit;

Case ID: 120401805

e.   attorneys' fees pursuant to the express terms of the Revised MRB Agreement; and

f.   such other and further relief as the Court deems just and proper.

**BRAVERMAN KASKEY, P.C.**

BY:   */s/David L. Braverman*
      David L. Braverman (ID No. 35145)
      Richard S. Julie (ID No. 205384)
      One Liberty Place, 56th Floor
      1650 Market Street
      Philadelphia, Pennsylvania 19103
      *Attorneys for Plaintiffs*

Dated: April 16, 2012

9

## VERIFICATION

I, Bennett S. Meyer, chairman and chief executive officer of The Meyer-Chatfield Corporation, a plaintiff in the within action, hereby verify that all of the facts alleged in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that this verification is made subject to 18 Pa.C.S.A. §4904, relating to unsworn falsification to authorities.

_____
Bennett S. Meyer

Dated: April 16, 2012

1

*Filed and Attested by*
*PROTHONOTARY*
*16 APR 2012 05:55 pm*
*J. MURPHY*

# EXHIBIT   A

## AGREEMENT

This Agreement ("Agreement") is made the 26th day of June 2008, by and among Bennett Meyer ("Meyer"), a Pennsylvania resident, with an address at The Pavilion, 261 Old York Road, Suite 614, Jenkintown, PA 19046, Meyer Chatfield, Corp. ("MC"), a Pennsylvania corporation, with a principal place of business at The Pavilion, 261 Old York Road, Suite 614, Jenkintown, PA 19046, Alan J. Ross ("Ross"), a Massachusetts resident, with an address at 687 Highland Avenue, Needham MA 02494, and The Alan J. Ross Insurance Agency, Inc., dba SAVE Associates ("SAVE"), with a principal place of business at 687 Highland Avenue, Needham MA 02494 and Braverman Kaskey PC ("BK"), a Pennsylvania professional corporation with a principal place of business at 1650 Market Street, 56th Floor, Philadelphia, PA 19103.

### WITNESSETH:

WHEREAS, Ross and/or SAVE is/are the owner of a fifty percent (50%) ownership interest in United States Patent No. 5,974,390 (the "Patent");

WHEREAS, Balshe LLC and the Simon Law Firm (the "Plaintiffs") have filed suit against Ross and SAVE in the Circuit Court of Cook County, Illinois, County Department, Chancery Division, contending breach of contract and that the Plaintiffs are the owner of the Ross/SAVE interest in the Patent (the "Litigation");

WHEREAS, Ross and SAVE engaged BK to represent them in the Litigation on a contingency fee basis;

WHEREAS, BK accepted such engagement to represent Ross and SAVE in the Litigation;

WHEREAS, Ross and SAVE require substantial funds in order to commercially exploit the patent;

WHEREAS, Meyer and MC are willing to provide the funding and insurance expertise to commercially exploit the patent;

WHEREAS, Ross, SAVE, Meyer and MC have agreed to a settlement of the Litigation (the "Settlement") which is embodied in that certain written settlement agreement dated June 26, 2008 by and among Balshe LLC, The Simon Law Firm, Ross, SAVE and MC (the "Balshe Settlement Agreement");

WHEREAS, the Settlement will result in the Patent being owned by a newly formed created entity (the "Patent Entity") which will be partially owned by Plaintiffs, SAVE and MC or its designee; and

WHEREAS, as a result of the Settlement and the attendant shift in the economics created thereby, the parties hereto have agreed to the terms of a new arrangement which shall supersede their prior written agreement dated June 5, 2008 (the "June 5 Agreement");

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    **Transfer of Ownership of Patent.**

Ross and SAVE shall transfer all of their right, title and interest in the Patent to the Patent Entity in accordance with the terms of the Balshe Settlement Agreement.

2.    **Ownership of Newco and Division of Proceeds/Income.**

(a)    MC shall cause the forty five percent (45%) voting equity interest that it will receive in the Patent Entity pursuant to the terms of the Balshe Settlement Agreement to a limited liability company to be formed by BK ("Newco"). The initial ownership of membership interests in Newco shall be as follows: (a) BK and/or its shareholders shall receive a 22.23% equity ownership interest; (b) Ross shall receive a 25% equity ownership interest; and Meyer shall receive a 52.77% equity ownership interest. MC, Meyer and BK each acknowledge and agree that Ross shall be the sole owner of the of 10% non-voting equity interest that he will receive in the Patent Entity pursuant to the terms of the Balshe Settlement Agreement (the "Ross 10% Interest"), and that MC, Meyer and BK shall not have any right to share in any revenue or sale proceeds Ross receives with respect to the "Ross 10% Interest."

(b)    In the event that after the initial formation of Newco, a new investor is sold an equity interest in Newco or an interest in Newco's cash flow derived from the Patent Entity, the parties will effectuate such sale, and split the sale proceeds, through a pro rata sale of their respective percentage equity ownership interests in Newco.

(c)    All distributions of BOLI PBT Profits, IOLI PBT Profits, COLI PBT Profits and GOLI PBT Profits that Newco receives from the Patent Entity shall, after the payment of Newco's expenses, be divided and distributed as follows: (i) 17.09% to BK; (ii) 31.67% to Ross; and (iii) 51.24% to Meyer. MC, Meyer and BK each acknowledge and agree that they shall not have any right to share in any distributions of BOLI PBT Profits, IOLI PBT Profits, COLI PBT Profits and GOLI PBT Profits that Ross receives from the Patent Entity with respect to the "Ross 10% Interest and that such distributions shall belong exclusively to Ross.

2

Case ID: 120401805

3.    **Management of Newco.**

(a)    Management of Newco shall initially be governed by a three (3) member executive committee (the "Executive Committee"), comprised of Meyer, Ross and David L. Braverman. Prior to the sale of an equity interest in Newco to a new investor, all management decisions will require the unanimous vote of the Executive Committee. Subsequent to the sale of an equity interest in Newco to a new investor, all management decisions for Newco will require the affirmative vote of members holding 65% or more of the membership interests in Newco.

(b)    No member of Newco, without the prior consent of the Executive Committee, shall be authorized to pay or obligate Newco to pay any sum in excess of $10,000 on any one item.

4.    **Compensation to and Obligations of Ross.**

(a)    Meyer shall cause MC to pay Ross: (i) $13,333 per month for 6 months, the first such payment to be made on August 1, 2008, with each subsequent payment to be made on the 1st day of each succeeding month; and (ii) $6,666 per month for the succeeding 6 months. Notwithstanding anything herein to the contrary, in the event that: (i) after the initial formation of Newco, a new investor is sold an equity interest in Newco or in interest in Newco's cash flow (either through a direct investment in Newco or through a sale of a portion of Ross's, Meyer's and BK's ownership interests in Newco); (ii) after the initial formation of the Patent Entity, a new investor is sold an equity interest in the Patent Entity or an interest in the Patent Entity's cash flow and/or (iii) Ross receives distributions of cash flow from Newco and/or the Patent Entity in an amount equal to or in excess of the payments MC is obligated to pay to Ross under the preceding sentence, Meyer and MC shall not have any obligation to make any of the remaining monthly payments set forth in the preceding sentence.

(b)    Ross agrees that upon the formation of Newco, for a minimum period of two (2) years, he will work exclusively for MC and will not engage in external employment or consultancy work, that he will use his best efforts to sell new BOLI and COLI insurance cases in conjunction with MC's sales representatives.   Ross will execute MC's standard form sales representative agreement and shall be entitled to commissions on sales of BOLI and COLI based upon the same commission schedule MC uses with its other sales representatives. Meyer, will cause MC's staff, located at MC's Jenkintown, Pennsylvania offices, to provide Ross with administrative assistance with respect to Ross's sales efforts. Ross will pay his own expenses when traveling to Jenkintown, PA or anywhere within a 100 mile radius thereof. MC will pay Ross's expenses for any other travel in the course of his duties for MC in accordance with the terms of MC's standard form sales representative agreement.

3

(c)    Notwithstanding the provisions of subsection (b), Ross shall be permitted to enroll policy owners into PBT Trusts created and/or controlled by the Patent Entity and to receive fees regularly paid by the Patent Entity and/or PBT Trusts to other persons with respect to such policy enrollments.

5.    **Obligations of Meyer.**

Meyer shall pay all costs associated with setting up of Newco.

6.    **Obligations of BK.**

(a)    BK will represent Ross, SAVE, Meyer and MC in the settlement of the Litigation, set up Newco and advise Ross, SAVE, Meyer and MC on the best form of entity and the jurisdiction in which the Patent Entity should be formed.

(b)    Ross and SAVE each acknowledge and agree that BK currently represents Bennett Meyer and MC in a variety of matters unrelated to the Litigation and that regardless of any dispute that may arise under this Agreement or otherwise, BK shall be free to represent Bennett Meyer and/or MC in such matters. Ross and SAVE each further acknowledge and agree that BK has advised each of them that while the interests of all of the parties to this Agreement are currently aligned with respect to the Litigation and the Settlement, there is a substantial risk that a conflict of interest may arise between their respective interests and that if a conflict of interest does arise among them, BK shall be free to represent it own interests as well as those of Bennett Meyer and/or MC in any dispute with Ross, SAVE, Newco and/or the Patent Entity.

7.    **Representations and Warranties of Ross and SAVE.**

Ross and SAVE each represents and warrants to Meyer, MC and BK that:

(a)    he/it has the power to execute, deliver and perform under this Agreement and no consent of any other party and no consent, license, approval or authorization of, or registration or declaration with, any governmental authority, bureau or agency is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement;

(b)    this Agreement, when executed by all parties, will constitute valid obligations of Ross/SAVE, legally binding upon him/it and enforceable in accordance with its terms;

(c)    the execution and delivery of this Agreement and the performance under this Agreement by Ross or SAVE will not violate or contravene any provision of any existing decree of any court, governmental authority, bureau or agency or any other agreement to which Ross or SAVE is a party;

4

(d)     with the exception of the Litigation no actions, suits or proceedings before any court or governmental department or agency are pending or, to his/its knowledge threatened against , which would prevent Ross or SAVE from performing his/its duties under this Agreement;

(e)     Ross or SAVE has no ongoing relationship with any competitor of MC and is free to enter into this Agreement, unencumbered by any contractual or other restrictions;

(f)     Ross and/or SAVE is the owner of a fifty percent (50%) interest in the Patent, that such interest in the Patent is free of any lien or encumbrance and that he/it has the absolute right to assign such interest in the Patent to the Patent Entity;

(g)     SAVE has less than $125,000 of outstanding debt/obligations, that no creditor has any interest in or lien or encumbrance on the Patent and that neither MC, Meyer or BK has any liability for SAVE's outstanding debt/obligations; and

(h)     SAVE and Ross have had the opportunity to be represented by counsel of their own choosing, understand this Agreement and knowingly and voluntarily have entered into this Agreement.

9.     <u>Indemnification.</u>

SAVE and Ross shall indemnify, defend and hold harmless, Meyer, MC and BK, and their respective shareholders, directors, officers, employees and agents, from and against any damages, losses, costs and expenses (including attorneys' fees) suffered by any such party, as a result of a breach of this Agreement by SAVE and/or Ross or suffered as a result of the enforcement by Meyer, MC and/or BK of this Agreement. If Meyer, MC and/or BK shall prevail in any action at law or in equity to enforce any provision of this Agreement, SAVE and Ross shall pay Meyer's, MC's and/or BK 's costs and expenses, including attorneys' fees, incurred in enforcing this Agreement.

10.     <u>Prior Agreements Superseded.</u>

Each of the parties to this Agreement acknowledges and agrees that this Agreement supersedes the June 5 Agreement in its entirety.

11.     <u>Governing Law; Forum Selection.</u>

(a)     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to the provisions on conflicts of law.

5

Case ID: 120401805

(b)     For the purpose of any suit, action or proceeding arising out of or relating to this Agreement, each of the parties hereby irrevocably consents and submits to the exclusive jurisdiction and venue of any of the Courts of the Commonwealth of Pennsylvania including the Court of Common Pleas of Montgomery County and Philadelphia County and the Federal District Court for the Eastern District of Pennsylvania, and appoints and constitutes the Secretary of State of the Commonwealth of Pennsylvania as his agent to accept and acknowledge on his behalf all service of process in connection with any such matter, copies of which process shall be mailed or delivered to the party being served. Each party irrevocably waives any objection which he or it may now or hereinafter have to the laying of the venue of any suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such a court has been brought in an inconvenient forum and agrees that service of process in accordance with the foregoing sentence shall be deemed in every respect effective and valid personal service of process upon a party hereto.

12.    **Entire Agreement; No Oral Change.** This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior and/or contemporaneous agreements and understandings among the parties hereto, whether oral or written. This Agreement may be amended only by a written instrument duly executed by all of the parties hereto.

13.    **Waivers.** A waiver of a party's rights under this Agreement shall be effective only to the extent set forth in a written instrument executed by the waiving party. No waiver by any party of any misrepresentation or breach (whether intentional or not), in any one or more instances and for any period of time, shall be deemed or construed as a waiver of any prior or subsequent misrepresentation or breach of the same or any other provision. No course of dealing or forbearance, leniency, delay or other omission by a party to assert, exercise or enforce any right or remedy under this Agreement or any other agreement, instrument or document at any one or more times or for any periods of time shall impair or otherwise affect any such right or remedy or any other right or remedy, or be construed to be a waiver or acquiescence; nor shall any single or partial exercise of any right or remedy, or any abandonment or discontinuance of steps to enforce such a right or remedy, preclude any further exercise of the same or any other right or remedy, it being agreed that at all times each party shall have the right to insist upon and enforce strict compliance with each and every provision of this Agreement

14.    **Construction.** The terms "hereby," "herein," "hereof," "hereto" and "hereunder" mean, respective, by, in, of, to and under this Agreement as a whole, not merely to the provision in which such term is used. The term "or" shall be construed to be inclusive and have the meaning of "and/or". The masculine form, wherever used herein, shall be construed to include the feminine and the neuter, and vice versa, where appropriate. The singular form, wherever used herein, shall be construed to include the plural, and vice versa, where appropriate. The definitions in this Agreement shall apply equally to both the singular and plural of the terms defined. The term "include" (and correlative terms, such as

6

"includes" and "including") shall not be construed as a term of limitation in any context but shall be construed as if followed by the words "without limitation." All references in this Agreement to an "Exhibit" or "Section" shall be to such exhibit or section of this Agreement, unless otherwise specifically provided. The captions of Sections are for the convenience of reference only; they form no part of this Agreement and shall not limit or otherwise affect the interpretation of any provision herein.

15.     Counterparts.

This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

16.     Severability. Any provision contained in this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

BENNETT MEYER

Meyer Chatfield, Corp.

By: _____

ALAN J. ROSS

The Alan J. Ross Insurance Agency, Inc.

By: _____

7

Case ID: 120401805

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

BENNETT MEYER

Meyer Chatfield, Corp.

By:_____

ALAN J. ROSS

The Alan J. Ross Insurance Agency, Inc.

By:_____

Braverman Kaskey P.C.

By:_____

8

Case ID: 120401805

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

BENNETT MEYER

Meyer Chatfield, Corp.

By:_____

ALAN J. ROSS

The Alan J. Ross Insurance Agency, Inc.

By:_____

Braverman Kaskey P.C.

By:_____ John E. Kaskey, Vice President

8

Case ID: 120401805

*Filed and Attested by*
*PROTHONOTARY*
*16 APR 2012 05:55 pm*
*J. MURPHY*

# EXHIBIT  B

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement (the "Agreement") is entered into this 26th day of June, 2008 by and among: (i) Balshe LLC and The Simon Law Firm (collectively "Balshe"); and (ii) Alan J. Ross ("Ross") and SAVE Associates (Save Associates and Ross are sometimes collectively referred to as "SAVE"); and (iii) The Meyer-Chatfield Corporation ("MC") (Balshe, SAVE and MC are collectively referenced herein as the "Parties" and individually referenced as a "Party").

WHEREAS, on May 27, 2008, Balshe filed a Verified Complaint for Injunctive and Other Relief in the Circuit Court of Cook County, Illinois, styled, *Balshe LLC and The Simon Law Firm v. Alan J. Ross and SAVE Associates*, No. 08 CH 19180 (the "Action"), in which Balshe asserted, inter alia, that Ross had sold to Balshe all of his right, title and interest in United States Patent No. 5,974,390 (the "Patent");

WHEREAS, on June 5, 2008, Ross filed a Petition to Remove the Action to the United States District Court for the Northern District of Illinois, Eastern Division (the "Northern District");

WHEREAS, the Action is now pending in the Northern District as Case No. 08 CV 3256 (the "District Court Action");

WHEREAS, MC claims an interest in the Patent and the outcome of the District Court Action; and

WHEREAS, the Parties intend to settle all disputes and claims between them regarding the ownership and commercial exploitation of the Patent.

NOW, THEREFORE, in consideration of the foregoing recitals (which recitals are expressly incorporated herein by this reference), the mutual covenants contained herein, and the terms and conditions hereof, and other good and valuable consideration, the receipt and sufficiency of which consideration are hereby mutually acknowledged, the Parties hereto agrees as follows:

1.      The Parties shall form a new entity ("Newco") for the purpose of commercially exploiting the Patent through the enrollment of bank-owned life insurance ("BOLI"), carrier-owned life insurance ("IOLI"), non –BOLI and non-IOLI corporate-owned life insurance ("COLI") and/or government-owned life insurance ("GOLI") in one or more trusts (each a "PBT Trust") utilizing the Patent. The form and jurisdiction in which Newco will be organized/created shall be as mutually agreed to by Balshe and MC. The ownership and management of Newco shall be in accordance with this Agreement.

2.      SAVE and Ross shall execute all necessary documents to assign to Newco all right, title and interest in the Patent held by Ross and SAVE, and any of his/their affiliates, parents and assigns.

3.      Newco shall use its reasonable best efforts to acquire all right, title and interest in the Patent held by an affiliated entity of the AXA Group, as successor in interest to the

*AJR*

Mutual Life Insurance Company of New York ("AXA") (the "AXA Patent Interest"). SAVE shall exercise its option on the AXA Patent Interest on behalf of Newco and immediately assign the AXA Patent Interest to Newco. Balshe and MC shall share equally the cost of acquiring the AXA Patent Interest.

       4.      SAVE shall be granted a ten percent (10%) non-voting equity interest in Newco. Balshe and MC shall each be granted a forty five percent (45%) voting equity interest in Newco. All equity interests shall enjoy tag-along rights upon the sale of Newco and subject to drag-along rights by the remaining equity interests upon a purchase offer exceeding an amount to be negotiated by the parties in good faith at a later date approximating $1 billion. Any equity interests exercising tag-along rights shall participate on a 1/3 basis if the purchase or contribution of additional equity does not result in a complete sale of Newco. The Parties acknowledge that MC may transfer a portion of its ownership interest in Newco to SAVE or other third parties.

       5.      MC shall have the exclusive right to manage all aspects of Newco's involvement with BOLI with respect to any PBT Trust. Notwithstanding the foregoing, the Parties acknowledge that Balshe retains the right to negotiate with banks, including foreign banks and those that have large capital markets groups or which are primary dealers, to participate in broader strategic businesses. Balshe is free to conduct those negotiations in its sole discretion, and without MC's interference, provided that Balshe shall not enter into transaction for the creation, sale, or structure of BOLI policies, or the enrollment of BOLI policies in a PBT Trust, without MC's prior written consent, which consent shall not be unreasonably withheld.

       6.      The Parties agree that Balshe shall be permitted to form a strategic relationship (a "Balshe Strategic Partner") with up to three (3) banks, provided, however, that under no circumstances will any bank which is not interested in forming a strategic partnership broader than the purchase and enrollment of BOLI policies into a PBT Trust, be a Balshe Strategic Partner. Any sales of BOLI and/or IOLI by Balshe shall be effectuated through MC and Balshe shall be entitled to BOLI and/or IOLI insurance commissions with respect to new BOLI policies and/or IOLI policies sold through MC at the highest rate that MC compensates any of its agents, and shall further be entitled to commissions relating to the replacement of any BOLI policy and/or IOLI policy owned by a Balshe Strategic Partner that reaches maturity and is replaced by MC ("Replacement Revenue"), or any BOLI policy and/or IOLI policy exchanged by a Balshe Strategic Partner through MC pursuant to Section 1035 of the Internal Revenue Code ("Exchange Revenue") at the same rate.

       7.    (a)     Except as otherwise provided in subsection (b), all of Newco's net trust enrollment fees related to BOLI policies, the capture of any enhancements in the expected value of BOLI policies from the assignment of their net amount at risk (i.e. the excess of the total death benefit over the cash surrender value) ("NAR") into a PBT Trust, any net profits derived from trust renewal fees related to BOLI policies and any other net fees directly generated from the use of the PBT Trust relating to BOLI (collectively, "BOLI PBT Profits") shall be divided as follows: (a) ten percent (10%) to SAVE; (b) seventy two percent (72%) to MC; and (c) eighteen percent (18%) to Balshe.

(b)      BOLI PBT Profits with respect to the Balshe Strategic Partners shall be divided as follows: (a) ten percent (10%) to SAVE; (b) forty five percent (45%) to MC; and (c) forty five percent (45%) to Balshe.

(c)      Except for commission income otherwise payable to Balshe under Section 6, SAVE and Balshe each acknowledge and agree that MC shall retain all revenue related to insurance commissions and administrative fees it derives from its sale of BOLI, COLI, IOLI, GOLI, Replacement Revenue and Exchange Revenue. Balshe further acknowledges and agrees that Ross shall retain all revenue related to insurance commissions he derives from his sale of BOLI, COLI, IOLI, GOLI, Replacement Revenue and Exchange Revenue.

8.      Balshe shall have exclusive right to manage all of Newco's involvement with corporate-owned life insurance ("COLI") and government-owned life insurance ("GOLI") with respect to any PBT Trust. The parties acknowledge that MC has significant contacts with banks and other institutions and contemplate that MC will continue to maintain and develop such contacts to further the business of Newco and MC's traditional business, including the sale of BOLI and IOLI. MC shall not enter into transaction for the creation, sale, or structure of COLI and/or GOLI policies or the enrollment of COLI and/or GOLI policies in a PBT Trust, without Balshe's prior written consent, which consent shall not be unreasonably withheld.

9.      Except as otherwise provided in subsection (b), all of Newco's net trust enrollment fees related to COLI policies and/or GOLI policies, the capture of any enhancements in the expected value of COLI policies and/or GOLI policies from the assignment of their NAR into a PBT Trust, any net profits derived from trust renewal fees related to COLI policies and/or GOLI policies and any other net fees generated from the use of the PBT relating to COLI and/or GOLI (collectively, "COLI PBT Profits") shall be divided as follows: (a) ten percent (10%) to SAVE; (b) seventy two percent (72%) to Balshe; and (c) eighteen percent (18%) to MC.

(b)      In the event that Newco utilizes a methodology provided to it by MC, which methodology is similar to the methodology utilized by MC for BOLI transactions (the "MC Methodology"), MC's share of Newco's net fees generated from the use of the PBT relating to COLI and/or GOLI utilizing the MC Methodology (specifically excluding Newco's net trust enrollment fees, the capture of any enhancements in the expected value of policies from the assignment of their net assets at risk into a PBT Trust, and any net profits derived from trust renewal fees) shall be increased to: (i) forty-five percent (45%) for COLI and/or GOLI policies sold by or enrolled in a PBT Trust by MC; and (ii) twenty-seven percent (27%) for COLI and/or GOLI policies sold by or enrolled in a PBT Trust by Balshe.

10.      All of Newco's net trust enrollment fees related to IOLI policies, the capture of any enhancements in the expected value of IOLI policies from the assignment of their NAR into a PBT Trust, any net profits derived from trust renewal fees related to IOLI policies and any other net fees generated from the use of the PBT relating to IOLI shall be divided as follows: (a) ten percent (10%) to SAVE; (b) forty-five percent (45%) to Balshe; and (c) forty-five percent (45%) to MC.

*AJR*

11.     MC's and Balshe's splits of BOLI PBT Profits, COLI PBT Profits and GOLI PBT Profits set forth above shall be readjusted annually beginning on the third anniversary of the date of creation of Newco, based upon the proportion of policies enrolled by Balshe and MC in the PBT Trust(s), provided, however, that in no event shall: (i) MC's interest in BOLI PBT Profits or Balshe's interest in COLI PBT Profits and GOLI PBT Profits ever fall below 45%; and/or (ii) Balshe's interest in BOLI PBT Profits or MC's interest in COLI PBT Profits and GOLI PBT Profits ever fall below 9%. Moreover, no readjustments shall be made to a party's percentage interest once such party has enrolled a minimum of 25,000 lives in the PBT Trust. MC and Balshe each acknowledge and agree that no adjustment shall ever be made to SAVE's 10% non-voting interest in BOLI PBT Profits, COLI PBT Profits, IOLI PBT Profits and GOLI PBT Profits unless previously sold pursuant to Par. 4 hereof.

12.     MC and SAVE acknowledge and agree with Balshe that banks or companies that decide to assign the NAR of any policies held by them into a PBT Trust may be given, prior to enrollment of such policies in a PBT Trust or as allowed by the PBT Trust to other settlement companies, an option for BOLI and/or option or mandate for COLI and/or GOLI, as appropriate, to sell policies on lives approximately aged 67 or older to an asset management company affiliated with Balshe or other third-party investors (an "Age Policy"). MC and SAVE acknowledge and agree that Balshe shall retain all revenues relating to the purchase or sale of an Age Policy. MC agrees that it will not dissuade any banks from selling an Age Policy to such asset management company or other third-party investors. Balshe agrees that it will keep any Age Policy that is a BOLI policy that is purchased by Balshe or an asset management company affiliated with Balshe and is being serviced by MC in full force and effect and that MC will continue to administratively service such policies at its best price applicable for other policies, or at an arm's length market-competitive price, whichever is lower. Balshe further agrees that any Age Policy that is being serviced by MC and is sold to a third-party investor, that such Age Policy will not be exchanged pursuant to Section 1035 of the Internal Revenue Code. In the event that administrative servicing on any Age Policy that is serviced by MC is transferred to another administrator, either by Balshe, its affiliates, or a third-party investor, Balshe shall reimburse MC for the net profit lost by MC as a result of the transfer of the administrative servicing based on MC's prices or an arm's-length market-competitive price, whichever is lower. For the sake of clarity, the Parties acknowledge and agree that the purpose of this Section is to reimburse MC for loss of its servicing revenue or residual commissions for policies which are purchased or sold to an asset management company affiliated with Balshe or other third-party investors and that nothing herein should be construed to permit MC to recover revenue it would not otherwise have obtained, such as, for example and illustrative purposes only, if the Age Policy would have otherwise matured, or if MC would not have otherwise received administrative servicing fees were the policy not an Age Policy.

13.     On or before July 31, 2008, Balshe shall pay MC $125,000 to reimburse MC for half of MC's out of pocket costs. Balshe shall be entitled to the use of any illustration systems developed by MC relating to the exploitation of the Patent.

14.     The Parties agree to share on a 50%/50% basis between Balshe and MC all expenses incurred after the date of this Agreement, which are necessary to develop the business of Newco, including, without limitation, the procurement of additional patents.

Otherwise, the Parties agree to bear their own expenses, including, but not limited to, offices and overheard relating to their separate offices and marketing operations, and owner-related expenses.

15.     Each party to this Agreement covenants to each other party to this Agreement that it will not take any action that will harm or damage the PBT Trust. For the sake of clarity, the Parties acknowledge that activities contemplated by this Agreement shall not be construed as harming or causing damage to the PBT Trust.

16.     Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC, on behalf of itself/themselves and each of its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys, executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "Balshe Releasors") forever release and discharge Ross, SAVE, Bennett Meyer and MC, and each of his/its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns (the "Paragraph 16 Releasees"), of and from any and all duties and obligations and all claims, demands, actions or causes of action, debts, sums of money, accounts, damages, judgments and demands whatsoever, whether at law or in equity, whether presently known or unknown, whether matured, unmatured, potential or contingent, and whether in tort, in contract, or otherwise (the "Claims"), which the Balshe Releasors ever had, now have or may have, or hereafter can, shall or may have against the Paragraph 16 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the Balshe Releasors may assert against a Paragraph 16 Releasee for the breach by such Paragraph 16 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

17.     Ross and SAVE on behalf of himself/itself/themselves and each of his/its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "SAVE Releasors") forever release and discharge Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC and each of its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns (the "Paragraph 17 Releasees"), of and from any all Claims, which the SAVE Releasors ever had, now have or may have, or hereafter can, shall or may have against of the Paragraph 17 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the

ASR—

beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the SAVE Releasors may assert against a Paragraph 17 Releasee for the breach by such Paragraph 17 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

18.    MC and Bennett Meyer, on behalf of itself/himself/themselves and each of his/its/their respective shareholders, officers, directors, employees, agents, subsidiaries, affiliates, heirs, legal representatives, attorneys, executors, beneficiaries, trustees, administrators, successors and assigns predecessors, successors and assigns and all of its/their affiliated organizations and entities (the "MC Releasors") forever release and discharge Balshe LLC, Simon Law Firm, STP Enterprises, Inc., David Simon, Nicomedes Sy Herrera, Pierre Wolf, David Henritze, Robert Stuchiner and Corridor Capital Group Holdings LLC and each of its/their respective shareholders, officers, directors, employees, agents, attorneys, subsidiaries, affiliates, heirs, legal representatives, executors, beneficiaries, trustees, administrators, successors and assigns, (the "Paragraph 18 Releasees"), of and from any Claims, which the MC Releasors ever had, now have or may have, or hereafter can, shall or may have against of the Paragraph 18 Releasees, for, upon, or by reason of any action, cause, matter or thing, whatsoever, from the beginning of time to the date hereof; provided, however, that nothing herein shall release, remise, remit, discharge or in any way affect any actions, causes of actions, suits, debts, dues, damages, sums of money, accounts, covenants, contracts, controversies, agreements, loans, promises, executions, judgments, claims, demands or defenses that all or any of the MC Releasors may assert against a Paragraph 18 Releasee for the breach by such Paragraph 18 Releasee of any of his/its representations, warranties, covenants, agreements and obligations under this Agreement. The foregoing release, when pleaded, shall be and constitute a complete defense to any proceeding of any kind that violates its terms.

19.    This Agreement contains the entire agreement between the Parties relating to the rights herein granted and the obligations herein assumed, and completely merges and supersedes any prior written or oral agreements or representations between the Parties concerning the subject matter hereof. Any oral representation or modification concerning this Agreement shall be of no force or effect. This Agreement can be modified only by a writing signed by all of the parties to this Agreement. All Parties warrant that no statement, promise, representation, warranty, condition, inducement or agreement of any kind with respect to the subject matter of this Agreement shall be, or has been, relied upon by the respective Party unless specifically contained and incorporated herein.

20.    This Agreement shall be governed under the laws of the State of Delaware. The parties agree that the Northern District shall retain jurisdiction to enforce or settle any disputes arising out of or relating to this Agreement and agree that they will not dispute jurisdiction in the Northern District.

21.     Each Party has participated in, cooperated in, or contributed to the drafting and preparation of this Agreement. In any construction of this Agreement, this Agreement shall not be construed for, or against, any Party, but shall be construed fairly according to its plain meaning.

22.     The Parties acknowledge that their respective rights and obligations are intended to be included in future documents to be executed by the Parties, including, without limitation, the documents necessary for the formation and governance of Newco and any documents necessary to effectuate the assignment and recordation of assignment of the Patent with the United States Patent and Trademark Office. The Parties agree to cooperate in good faith to execute any and all necessary documents to effectuate the terms of this Agreement.

23.     Ross and SAVE Associates warrant that they have not assigned any right, title or interest in the Patent to any person or entity other than AXA, and that they have no reason to believe that AXA has transferred any or all of its right, title or interest in the Patent to any other person or entity. Balshe warrants that it has not assigned any right, title or interest in the Patent to any person or entity. MC warrants that it has not assigned any right, title or interest in the Patent to any person or entity.

24.     The Parties shall seek and obtain, as soon as practicable, the dismissal with prejudice of the District Court Action, including all claims and counterclaims made therein, with each Party to bear its/his own costs and attorney fees.

25.     The provisions of this Agreement are severable. If any provision of this Agreement is declared invalid or unenforceable by a tribunal of competent jurisdiction, the ruling will not affect the validity and enforceability of any other provision of the Agreement.

26.     The Parties may disclose the terms of this Agreement as reasonably necessary to satisfy all applicable laws and pre-existing contractual obligations or in enforcement of this Agreement; otherwise the terms of this Agreement shall be held as strictly confidential information.

27.     Each party to this Agreement agrees to indemnify and hold each of the other parties to this Agreement harmless from and against any loss, damage (including incidental and consequential damages), deficiency, cost, expense (including costs of investigation and reasonable attorneys' fees) claims, actions or judgments, whether or not involving a third-party claim, resulting from: (i) its breach of any representation or warranty contained in this Agreement; and (ii) its failure to perform any of its obligations under this Agreement or any other agreement contemplated by this Agreement.

**[The remainder of this page is intentionally left blank.]**

BALSHE LLC

By: _____

Title: _Managing Member_

Dated: _6/27/08_

THE SIMON LAW FIRM

By: _____

Title: _Owner_

Dated: _6/27/08_

_____
Alan R. Ross

Dated: _____

SAVE ASSOCIATES

By: _____

Title: _____

Dated: _____

MEYER-CHATFIELD CORP.

By: _____

Title: _____

Dated: _____

8

BALSHE LLC

By: _____

Title: _____

Dated: _____

THE SIMON LAW FIRM

By: _____

Title: _____

Dated: _____


_____
Alan R. Ross

Dated: June 27, 2008 _____

SAVE ASSOCIATES

By: _____

Title: President _____

Dated: June 27, 2008 _____

MEYER-CHATFIELD CORP.

By: _____

Title: _____

Dated: _____

**BALSHE LLC**

By: _____

Title: _____

Dated: _____

**THE SIMON LAW FIRM**

By: _____

Title: _____

Dated: _____

_____
Alan R. Ross

Dated: _____

**SAVE ASSOCIATES**

By: _____

Title: _____

Dated: _____

**MEYER-CHATFIELD CORP.**

By: _BesJAMeyer_

Title: _CEO_

Dated: _6-27-08_

Case ID: 120401805

The undersigned hereby execute and join in this Agreement solely for the purpose of effectuating the Releases contained in Sections 16, 17 and 18.

CORRIDOR CAPITAL GROUP
HOLDINGS LLC

By: _____            _____

                                        Bennett S. Meyer

Title: _____          Dated: _____

Dated: _____

STP ENTERPRISES, INC.

By: _____

Title: __V.P._____

Dated: __6/27/08_____


_____
Pierre Wolf

Dated: _____


_____
Nicomedes Sy Herrera

Dated: _____

_____
David Simon

Dated: __6/27/08_____


_____

9

The undersigned hereby execute and join in this Agreement solely for the purpose of

effectuating the Releases contained in Sections 16, 17 and 18.

CORRIDOR CAPITAL GROUP
HOLDINGS LLC

By: _____              _____
                                           Bennett S. Meyer

Title: _____            Dated: __6-27-08_____

Dated: _____

STP ENTERPRISES, INC.

By: _____

Title: _____

Dated: _____


_____
Pierre Wolf


Dated: _____

_____
Nicomedes Sy Herrera


Dated: _____

_____
David Simon


Dated: _____

_____

Case ID: 120401805

The undersigned hereby execute and join in this Agreement solely for the purpose of

effectuating the Releases contained in Sections 16, 17 and 18.

CORRIDOR CAPITAL GROUP
HOLDINGS LLC

By: _____         _____

                                      Bennett S. Meyer

Title: _____        Dated: _____

Dated: _____

STP ENTERPRISES, INC.

By: _____

Title: _____

Dated: _____

_____
Pierre Wolf

Dated: _____

_____
Nicomedes Sy Herrera

Dated: 27 June 2008

_____
David Simon

Dated: _____

_____

9

Robert Stuchiner

Dated

David Henritze

Dated: June 27, 2008

Case ID: 120401805

Jun 30 2008 15:13    Synergy Life Brokerage    1-212-929-4115    p.9

The undersigned hereby execute and join in this Agreement solely for the purpose of effectuating the Releases contained in Sections 16, 17 and 18.

CORRIDOR CAPITAL GROUP
HOLDINGS LLC

By: _____

                                _____
                                Bennett S. Meyer

Title: _____

                                Dated: _____

Dated: _____

STP ENTERPRISES, INC.

By: _____

Title: _____

Dated: _____


_____
Pierre Wolf

Dated: _____


_____
Nicomedes Sy Herrera

Dated: _____


_____
David Simon

Dated: _____

                               9

Case ID: 120401805

Jun 30 2008 15:13        Synergy Life Brokerage        1-212-929-4115        P.10

Robert Stuchiner

Dated: 6-30-08

_____
David Henritze

Dated: _____

10